We'll hear from the United States v. Franklin Brown. We have just a moment to set up. Yes, sure. You're not going to show and tell? No. No, no, no. It's a big appendix. I just want it out. We've extended Council's time, not as much as you wanted, but... That's a fairly unusual setup. Oh, I have a question for that. Fortunately, I don't want those things. May it please the Court, my name is Peter Goldberger. It's my privilege this morning to represent Franklin Brown, who was the defendant below and the appellant here at the table with me, my colleagues Nathan Dershowitz and Amy Adelson. Mr. Goldberger, I know that you told us who was going to do what. Yes. Are you doing the tape issue? No. So let me review that, exactly what I wanted to say. And we appreciate the extension of time. Even so, the case is so large and complicated, we're going to have to be kind of summary of what we cover and try to follow your lead. You know that we'll ask you questions and that will take you. Of course. Mr. Dershowitz says that. We do plan to attack the issues in almost the reverse order that they're in the brief. I will address the sentencing and trial issues. Okay. Mr. Dershowitz will address the authentication of the tapes and the related denial of new trial. In order to leave some rebuttal time, we've asked the clerk to take one minute off my 10, two minutes off his, leave three minutes... One rebuttal, yeah. Leaving three minutes for rebuttal, which Mr. Dershowitz will handle on all issues without trying to jump up and down on rebuttal. Let me ask you a question, and I think you can answer this for either of you. As I read these long briefs, I'm not surprised, given counsel, I didn't see anywhere in which Mr. Brown says he didn't do it. Is that right? No, this case went to trial. That he didn't backdate the severance letters. He never... Oh, absolutely, but that's not an appellate position. No, no. This case went to trial. That was the position that the government didn't approve. But your briefs don't claim that he is innocent. Is that right? Just so we can put that... We have no appellate issue that says that, although it is certainly of the obstruction charges as framed, the authentication of the tapes issue could imply that. Right, and then he's going to talk about it. That's right. That's right. But this is a case that went to trial. The charges were contested. Mr. Brown, a 76-year-old lawyer for Rite Aid Corporation, was convicted on most of the charges, and he was sentenced to 10 years in prison. Mr. Goldberger? Yes. I'll let you almost get one whole sentence out. I finished the sentence. Are you handling the plea part of this? Yes. Having said this went to trial makes me want to ask you about the allegation that substantial rights were violated by the district court's handling of the plea negotiation. Can you be specific with us and tell us how, in this case, the substantial rights of Mr. Brown were negatively affected? Yes, and it's an unusual issue. I mean, you might ask yourself, how is it that having a trial could be a violation of your rights? Right. And I understand the question. And how is it that having more information was a negative for him? Well, the parties had reached a one-count deal, and they submitted to the judge in advance of the hearing. It doesn't have to happen, but it can happen, before the hearing at which the judge would consider the plea agreement. And the judge issued, as you know, a written statement the day before, saying, I will not accept this plea agreement. Now, the agreement had a five-year cap to it. It had a very high probability of a lower guideline range, substantially lower guideline range, an agreement he wouldn't be prosecuted for any other offenses. No, there was a promise to allow him to cooperate, and that the government would recommend, and this was very valuable in this case, three levels, the full three levels for acceptance of responsibility. He was going to benefit very substantially from this agreement if he could bring himself to accept it. If the court accepted it. Well, if the court were to accept it, yes. Because this was not a plea that the court was bound to accept. This was one that the court could have accepted had it chosen to, right? Well, that's complicated. The plea is one the court agreed it was bound to accept. That is, the court said and was right in saying that it would take the guilty plea to one count and grant the government's motion to dismiss all the other counts. What the court said is it would not accept the related agreement. You know how Rule 11 separates accepting the plea and accepting the agreement. It was error to reject the agreement, and that is what happened here, and this is what affected his rights and what essentially forced him to a trial with this outcome of the 10-year sentence. The court engaged, as the record shows, in ex parte communications with the prosecutors the day before, which it should not have done and which violated his rights by preforming an opinion. Well, let's leave that aside. Let's get to that in a minute because that's obviously something that's hotly contested. Well, I don't know that it's hotly contested. I sure took it to be hotly contested. I think it was contested. Okay, all right, we'll see. But setting that aside helped me understand if the court was not required to, and I don't hear you telling me, and I don't know what law you'd be relying on, to say that the court was in a position where it had to say, okay, I'm required to accept and to sentence in accordance with this. The court was not required to sentence, and there was no agreement to a sentence, and the court would not be required to sentence other than within the 5-year maximum. That's the case. And the court's misstep here, were there any, was to say the day before the hearing instead of at the hearing, hey, I'm just not buying this kind of a deal. This strikes me as offensive, et cetera, et cetera, et cetera. If that's the problem, how is that a negative for your client to sort of get the heads up that, oh, it might not work out for me so well if I actually plead. And that clearly is a true reading of what happened. But the court erred under Rule 11b1b in thinking that it had to accept this agreement, that it had the discretion to accept the agreement. All the court said was I want to see, before I do anything else. Oh, no, that's not all she said. That's not all she said. Didn't the court say I want to see the pre-sentence report? The court said that the judge had consulted with a probation officer informally, reached a tentative view of what the sentence would be, utterly improper. And having accepted the, having said that she would dismiss the other counts, which is the B1a part of the agreement, there was only a recommendation of sentence to be made, not a binding, and therefore there was nothing for the court properly within the proper role of a judge in this process to reject. Okay. Then there's two questions I have. Assume all that what you have said is true and it's error. Yes. Where is the harm in the error? The 10-year sentence instead of the five-year sentence at worst. It's gross prejudice. Which he very well may have gotten had he pled, right? No. She could give him anything she thought was appropriate. One count plea, five-year max. I don't understand something. Five-year max. On that one count. Okay. I'm sorry. What do you want us to do? Because you can't say, do you want us to order the district court to accept the agreement for the five-year maximum sentence? Yes. We've asked for it to be remanded. But even if the judge erred in what she did, all you could do is remand it. I mean, that wouldn't give you a basis to have it accepted, really because she acted improperly in how she went about rejecting it. The most it would give you, it doesn't make him innocent, obviously, but the most it would give you is a chance to reconsider it Maybe you'd ask for another judge. We did ask for another judge, but this or another judge, and we have argued that it would be an abuse of discretion to reject this agreement because the agreement did not impinge on the judicial role in any way. Well, I don't know of any case. Do you know of any case that supports that position? That's a remarkable position to say it's an abuse of discretion for a judge to say, I'm looking at the facts of the record here and I'm not comfortable with this. In effect, what you're saying is there is no discretion. The judge had to take this. In an agreement of this kind. That's right. Because any reason the judge would have. Give us some authority for that. It follows from Richard's decision on the separation of powers in the dismissal power. Once the judge agreed that it was the government's position and not the judge's to decide that a one-count conviction with a five-year maximum would serve the public interest, and that was an executive discretion decision, the court could not say, I won't allow this man to face only five years. That's not a judicial function. Where's your authority for that? Because that's a, candidly, that's a new one on me. I thought courts had the power to say, you know what, this is not an agreement that I'm prepared to put the imprimatur of the court on. If the court had a reason that was consistent with the judicial function in this process. Okay. So is there a case or a statute that says what you're saying here? 11B1B and the separation of, read in light of the separation of powers principles and the Rule 48 power to dismiss indictments read together, suggest that the grounds given by the judge, putting aside her injudicious language and her angry tone and the ex parte communications, all of that was not a proper exercise of a judicial function. Now all of this discussion has proceeded on the assumption that she rejected the plea. Yes. As a matter of fact, doesn't the record reflect that she said, look, I'm going to let you go back and think about this, and you can come back to me, but that Mr. Brown chose not to do that, and that's how the case went to trial. The judge said in writing the evening before, but not at the hearing because the hearing wasn't held. That's right. These are the reasons I have decided to reject the agreement. Not I have concerns, let's discuss them in court. I thought the record showed that the court actually said, I'm prepared to rethink this in effect, and I want you to think about it, and then we can talk about this some more, and that the ball was sort of left in your client's court. Am I remembering the record inaccurately? What you say is true, but it's only part of what happened. The judge agreed, invited the government to present her with more facts about relative culpability. She was making a prejudgment about culpability and appropriate sentence, which is not appropriate. If she asks the government to give her more facts, then she's not making a prejudgment. She's waiting to see the facts before she makes a decision. Why would she ask for more facts if she already had all the facts she needed? The record shows she had made up her mind, and then the prosecutor expressed concern about how this was going and sounding perhaps, and offered to present more facts, and she said, if you have more facts, I will hear them. But that would be more in the nature of reconsideration than of not having made up her mind. What's wrong with the judge saying, I will hear more facts? That in isolation is not wrong. I mean, we write for all the judges in the circuit. So what kind of opinion can we write that would suggest to a trial court, you can't accept an offer of getting more facts? If that were all there was, that would be wrong. But if you fairly describe what happened here and say it is improper, it is shocking and improper, you don't have to say it's shocking, but it was, that that would be appropriate guidance. The judge overstepped her role in the plea agreement process to the point of being involved, in effect, in plea bargaining by saying, go back and redo this. That's involvement in plea bargaining. So what she should have done, if I understand you right, what she should have done, according to the rule, is waited until the day of the hearing and then said, I can't accept this plea. This is something that is not, this is something I just can't. So actually, your view is, on the day of the hearing, she should have said, I have to accept this plea because it's strictly an executive function. Is that the, that's your position. Yes, right. But I'm warning you that you might very well get the maximum sentence after I've read the pre-sentence report and heard counsel at sentencing. Yeah. That's right. Okay. I think, I understand you. If I could turn to the sentencing point and just clear that up quickly. I was wondering. My timing is not the same as. My mental timing was also. So where do I stand? Good. Why don't you take a couple minutes, take two minutes on this, the other point. Thank you. Because I did want to say the easiest point here is the illegality of the sentencing. Here we are, we're in the fall of 2004. Remember, there was a very long process for this remand for the new trial hearing. So we're on direct appeal from a sentence imposed in the fall of 2004 before Booker. The judge did not properly anticipate, and who did, exactly how the Supreme Court would come out in Booker three months later. I think the judge did anticipate Booker. Oh, no. No, no, no. She anticipated that the Supreme Court would find a constitutional problem in the sentencing process, but what would happen from there was not correctly anticipated. She went with Judge Cassell's view, which turned out to be wrong, that the Supreme Court would throw out the entire federal sentencing statutory system and revert to purely discretionary, standardless sentencing. That's what the judge said that she was doing, was imposing a completely discretionary and standardless sentence. We know that from the reliance on the Williams case in her opinion. We know that from her statement of reasons where she said, I don't have to give reasons because this was a discretionary sentence. She said the guidelines played no part in my decision, although that wasn't really entirely true because we did spend a lot of time calculating the guidelines in earlier hearings. And this court's practice has been in that situation under the on-bank decision in Davis, of course you know, that it's been to vacate and remand for resentencing under the proper application of the proper principles. And he's been in prison five years now, and applying the proper factors, giving full consideration for a sentence that's no greater than necessary and all the sentencing factors, and having properly calculated the guidelines, I must say, at that time in 2004 there was no circuit authority on how to do laws. Do you think this violates Gunter? Do you think, you know, the Gunter opinion with respect to the extent Gunter survives, you know, the subsequent cases? Yes. I mean, our recent opinions say Gunter survives.  In part. Is he 81 now? I'm sorry? Was he 76 when he was prosecuted? Yes. So he's 81? He's in his 80s now, yes. Okay. Yes. Could you just go back? You have said, and I didn't get it, that it violated rule going back to 11B something. B1B? It was a B1B type thing. The right to plead not guilty or having already so pleaded to persist in that plea, why does it violate that? I'm sorry. Do I have it? Is it C maybe? Do I have the wrong subsection? I don't know. I don't have it in front of me. I'm looking at the criminal code. Let me see one. I understand. I'm sure you are, and I'm not, so. Yeah, I just can't find. I'm pretty good on my subsections, but I'm probably wrong on this one then. It's the kinds of plea agreements that I'm talking about that it was a non-binding. It's the features of the agreement for a non-binding recommendation. Once she accepted the subsection A feature, that is the dismissal of counts, which says it's in the court's discretion, but the discretion we know from the case law is very limited, then there was no reason. There was nothing in the features of the agreement that the judge pointed to that made it worthy of dismissal. Your position, if I've got it right, is not that this was the traditional C plea that binds the court. Right. It was a discretionary plea. Yes. Your problem is you think that it really doesn't have discretion here because this is an executive decision only whether or not to dismiss counts, if I've got that right. That's right. And there could be features in such an agreement that the judge couldn't tolerate and that would legitimately affect the judicial function, and the judge might in the judge's discretion say no to, but there were no such features in this agreement. The reasons given were reasons that are not the judge's business in this process. Okay. And we'll rest on the brief with respect to the McDade argument, which is an important one. Thank you. And a new one in this court. Thank you. Okay. We'll hear Mr. Dershowitz. Thank you, Your Honors. Nathan Dershowitz, and I'll be representing Mr. Brown on the Rule 33 motion. Although Mr. Greenberger did not get to the McDade issue, the Rule 33 motion relates to the tapes which had been made, we allege, in violation of McDade. Okay. I have a question. I've been waiting on the tapes because a lot of the briefs are focused on the tapes. Correct. Do you claim, so let me, maybe double question. Do you claim that anything was added to the tapes in the course of this transfer from digital to analog and analog to digital? Let me answer that in two different ways because I think it's a critical question. Yes, I know. The answer is there is no way, we know things were taken out of the tape. Okay. We know that certain things appear to have been put into a different place in the tape. Do you have any, is there any evidence of that? Yes, without a doubt. And the answer is, let me give you an example. I mean, we know that you claim that what appeared originally to have been Mr. Brown's statement wasn't Mr. Brown's statement. It was Mr. N's statement. Right. And all that was is, be good, tell the truth, or something like that. Well, there were two. One was that, and one had to do with the Atlantic Ocean, and the court was simply factually incorrect. Factually incorrect. Who said whether the typewriter, the computer was at the bottom? All said by Mr. Noonan. All right. Okay. Never by Mr. Brown. All right. But I didn't see anywhere where there was any allegation that something appeared in the tapes that really wasn't a statement by either Mr. Brown or Mr. Noonan. No. It's not a question of something that wasn't said by either. It's the placement. There is, for example, a statement of no-no, which is in a louder voice, which the experts said could not occur if you use a NAGRA, which has no volume control. So what obviously happened, according to the experts, is somebody on a digital device put that phrase in at a certain place where it was not in before. Did an expert say that? Yes. Yes, yes, yes, yes. Where? I'm sorry. Did you want to ask? Well, when you said the experts, you mean the defense experts, right? Yes. Let me clarify, and let me try to give an analogy, which I think will explain the underpinnings of what the claim is. My analogy would be to a football game. I don't know if your honors watch football, but assuming there's a call on the field. This one does watch football. Assuming there's a call. I watched the Eagles play the Giants the other night. Don't. I'm from New York, your honor. Assuming there's a call on the field that the catch was out of bounds, and you take a look at. They watch it a second time. They go under the thing. Right, and they go under, and they look at it in high definition, new technology, without a doubt it was caught. He had possession. He was in bounds. No doubt under the high definition. They take pictures of it. Another referee takes a look at an old television that's blurry, doesn't do any of the testing, doesn't look at the HD, refuses to look at the pictures, and says, I can't tell. That's the difference in the experts. There's no effective change in the substance, and I can't see why all this time is being spent on the analog to the. I mean, that's why I asked at the very beginning, you don't. I mean, he was proven guilty. The court found, the jury found he was guilty. Why are we spending all this time, all this space on the tapes? Three reasons, your honor. First is the government acknowledges that perhaps that was the most damning evidence in the case. Well, let's assume that. Okay. Second answer is that what occurs is if you tape over, if you cut, there is no way to tell if you take out sections, which is what is claimed here. There was stop starts. There was editing. There was deletions. If you cut out sections of a tape, it becomes inaccurate. Is there any evidence that anything of substance was removed from the tape? And that is the problem. The problem is we can say, yes, there were edits. We cannot tell if it's a 10-second, 10-minute, 20-minute edit that takes place. Your client is on the tapes. Your client was in the position of saying, I said X, Y, Z, and it's not there. Yes. And we have no such indication from the record. And what he says is, look, I remember and I know that this is inaccurate. That's not the way it occurred. You can't ask me, 76 years old or even my age or 12 years old, to remember exactly what was deleted. But the problem is, and that's exactly the problem, I do not and will not, I can remember that that is not the conversation that occurred. But if you ask me to say, what exactly did I say, you're putting a burden on me, which is impossible to satisfy. That's why he kept saying, look, I know I didn't say this in certain contexts. Let me, if I can, ask you a question, Mr. Dershowitz, about what has boiled down to a battle of experts with regard to the tape, right? The answer is no, Your Honor, and the reason I say that with all due respect. Mr. Berg is on the other side saying, no, this is solved, this is good. No. What you have is there are two problems. One is the Rule 16 problem, and let me just address that in a certain context. We had said Rule 16 doesn't apply. The court made us go through all of these hoops. Let's accept all of that as proper. Let's even for the moment hypothetically assume that it was proper to delay for three months to let the government recall the experts and cross-examine the experts, et cetera, et cetera, all of which I think was clearly an abuse of discretion, particularly finding Rule 16 doesn't apply. We know your position. Okay. Now let's go to what happens when they suddenly produce improperly in violation of what they said to the court, the agreements and everything else, this new expert. Assume that that's proper. The court ruled excluded three times, then puts him in there. He doesn't provide any, if you're looking for a search for the truth, he doesn't provide any of the evidence that would allow us to question him substantively compared to what we had to produce, but more important than that is if you read his conclusions, what he never did is look at the evidence. My example with respect to the HD. Hold on, Mr. Dershowitz, when you say he never gave you. If it's your assertion, I must not have read the brief closely enough. I was not under the impression that there was any claim here that Mr. Ginsburg had withheld information from you. He never gave us the backup materials to his examinations, never prepared a report which had the backup information as we were required to do and a month adjournment extensively producing that information. So your problem is that the court didn't make him produce something, not that he withheld something. That's right, and he had no backup. But my real claim, Your Honor, is we took the position from the beginning. It's very hard to detect edits that are done on a digital machine. New technology has allowed that to be done. We did it. We showed the evidence that it was done. Ginsburg never looked at it. He never looked at our evidence. I'll repeat it. He never looked at our evidence, the materials that we produced to the prosecutor, in order to show this is what we did. The example I'm giving with the HD. Never looked at the pictures of the HD as they came off the HD camera. He didn't look at that. He took his older technology, which we understand cannot be used to detect these edits, used the old technology, said I'm not going to look at the HD, I'm going to look at the bad television image, and I don't see it. He never tested for virgin tape. It wasn't an issue for me, he said. Did your suppression motion challenge the authenticity of the recordings? Yes. Are you sure? Did your suppression motion challenge? Oh, the suppression motion. No. No, the suppression motion did not. It came later, right? I mean, the way it was teed up to start with was that the October 2003 tapes were not an accurate copy. They were somehow different. It wasn't until you were in the courtroom that it was apparent that the attack was not just on those October 2003 tapes, but on the accuracy of the November 2005 things as well. Am I right? I mean, that's in the courtroom. They're hearing that, right? In the hearing, the argument was what you had – there are two arguments. One was what you have now produced to us is different from what you had produced to Mr. Owens back in 2003. But more important than that, these simply were not the original tapes. And let me just – if I can take one moment just – Yeah, because your red light is on. One moment. The jury presentation, which the court had originally said was critical. You know, what did the jury see? We presented evidence. We did it by a stipulation because the court said you have only one day. We had Brandt-Frederick's two affirmations that were produced, which dispose of the question and say it's inaccurate. The court says we didn't submit testimony. That's correct. Testimony in terms of oral, but a stipulation of the affidavits. The response to that, the prosecutor says in his brief footnote 38, that the Noel Herald affidavit in response is not in the appendix. It's not in the appendix because it wasn't admitted. So the undisputed evidence was by affidavits submitted by stipulation that showed that it was inaccurate. And she says I'm not going to deal with that. Okay. Do you have any more questions? No. Okay. Thank you. Thank you. We'll hear from – you have a question? Okay. We'll hear from Mr. Daniel. Good morning, Your Honors. Good morning. You're going to have to fix the mic. My name is Kim Daniel. I represent the government in this appeal. I'd like to address Mr. Dershowitz's arguments about the tapes. And to answer the court's question, no. Even the defense. Which question? It doesn't know the answer to. The question is whether or not there was any evidence of word editing on the tapes. Their own expert, Stuart Allen, testified, and the citation is at 4 Appendix 1622-23. There he found no evidence of word editing. Because this was an issue that was aggressively pursued with Mr. Allen and Mr. Owen by the government while they were on the stand. Please point out to us, do you believe that there are instances on these tapes where words have been substituted or words have been deleted? And he said no. He admitted no. This is the defendant's expert. Defendant's expert, Stuart Allen. What they focused on was glitches, pops, and noises. Things that our expert, Mr. Ginsberg, all explained as being normal. Recording anomalies in the course of a NAGRA recorder. Why don't you take on directly, Mr. Daniel, the assertion that Mr. Ginsberg, in essence their argument is it was an abuse of the court's discretion to accept the expert testimony of Mr. Ginsberg because he had no sensible foundation, particularly in light of the great high def TV style, high tech evidence that your experts had produced. Why don't you take that argument head on if you would. As I understand Mr. Dershowitz's complaint is that Mr. Ginsberg didn't look at their work product. Mr. Ginsberg wasn't interested in their work product. He was interested in authenticating to see whether or not he could authenticate the original NAGRA tape recordings. That's what he examined. That's what he subjected to analysis. That's what he listened to. That's what he meticulously applied his knowledge to in determining that it was authentic. He didn't spend time looking at the erroneously produced clones or tapes or digital copies that the defense experts banged their drum about. All right, so if I understand what you're saying, it's he had no obligation to look at it and it was up to the court to decide whether or not to accept whether his testimony was credible or not, even though he didn't bother to look at the defense evidence? He offered explanations for why the defense experts noted what they noted. He offered all rational explanations and logical explanations that the district court carefully considered and reviewed every one of these allegations in a 30-page opinion. Every one of the minor complaints that the defense experts pointed out, she reviewed, considered what they had to say, and then also took input from Mr. Ginsberg in reaching her own conclusion. But to get back to what the court mentioned earlier, this was not just a battle of experts, dueling experts. The court also relied upon the testimony of several witnesses, the men and women from the FBI who handled those tapes, who generated them, who created them, who put the machine on Tim Noonan's back, who put their initials on the tapes, who took custody of the tapes and had those tapes within their custody and control. They all testified that they did nothing to those tapes, that they were pristine and authentic, and they testified under oath. So even if we put the experts, the dueling experts aside, the district court would have been entitled to rely on that testimony alone in sustaining her conclusions. Was the extra loud no, no, no unexplained and unexplainable, as the defense says? Yes, I believe it was, and if we go back and take a look at Judge Rambo's opinion. You say it was unexplainable or was it unexplainable? I'd have to go back and look at it specifically, Your Honor, but in that 30-page opinion, you can only describe that opinion as being extremely meticulous and extremely comprehensive. She started out with a primer on how recordings are generated, the differences between analog recordings and digital. She then went on to the different techniques that were employed by the different experts. And then she examined each and every one of the complaints that the defense experts had raised during those four days of testimony and addressed each one. She paid careful, careful consideration to all the evidence, and she made carefully considered findings of fact all in the government's favor. What about the no-contact rule? I mean, you say they put it on his back. There was counsel. Why isn't all that a violation of your right to have to— Because this court, like many other courts, federal courts across this country, district court, and circuit courts, said it was permissible in Balter, specifically this court, that it is not a violation of the Pennsylvania no-contact rule or any other state's no-contact rule that have adopted the model rules. And that's what Pennsylvania has. When you look at Pennsylvania's 4.2 rule, it talks about the authorized by law exception. And there was nothing in the official commentary, though, about the well-recognized exception at that time about confidential informant, pre-indictment confidential informant investigations. But if you look at the model rule of professional conduct from 2001, you'll find a complete paragraph in there about that exception and about how many courts have recognized that exception. And the comments say this is outside the scope of the rule, confidential informant investigations in the pre-indictment stage. Pennsylvania did eventually get around to adding that paragraph to their rule in 2005, and that paragraph is there now. We have an obligation—well, we now—we're supposed to review sentences for reasonableness. Why is this long sentence reasonable? Absolutely. Well, yeah, you say yes. I didn't expect you to say no. But why? I mean, tell us why this really lengthy, extremely lengthy sentence was—we should consider reasonable. Because Judge Rambo was equally meticulous and comprehensive in addressing all the sentencing issues as she was on the older tapes. She complied fully, Your Honor, with Booker and, as you mentioned, Gunther case. She applied the guidelines to the case. She ruled on all the departure motions, several departure motions. But the last of the factors is that we have to look at it to see whether it's reasonable. Why isn't this longer than required under the circumstances? The guideline range that she found, after careful consideration, was 121 months at the low end. And quite frankly, I don't recall— But you're just telling us what she did, but not telling us why we shouldn't say what she did was unreasonable. But did you want to ask a question? Well, I just questioned the loss calculations, because she took the loss calculations as if there could have been no other factor involved other than the criminal conduct. I disagree. The stocks moved for other reasons. I disagree, Your Honor. I think she gave careful consideration to the possibility that that loss factor, if you're talking about the stock loss, she applied the average selling price methodology, which focuses on the price of the stock before the disclosure of the fraud is made and immediately thereafter. Well, that's great if you can say that nothing else could have affected it, but maybe legitimate things affected it. But that wasn't all that she did, Your Honor. She did several things beyond that. She then reduced that loss by the percentage by which the criminal earnings were inflated. The company restated $500 million, announced a $500 million restatement on October 18th. That was our end point in that window that we looked at in calculating the share loss. But we only were able to prove during the trial that Mr. Brown was involved in $92 million of that $500 million inflation. So she reduced the loss by almost 80%. Since the criminal earnings were only 18% of the $500 million, she reduced it by that percentage. She also did two more things, advocated by the defense. She took the $0.11 dividend out of the calculation to reduce the actual loss, and she also greatly reduced the number of shares that were hurt by the fraud. The government prepared numbers based upon the total number of innocent shares, and by that I mean all shares held by anyone except the defendant. Judge Rambo cut that number in half, and she only used the number of shares that were actually traded during the time period. The numbers that actually were come up with under the three windows that we looked at, six days, seven days, and eight days, before and after the disclosure, were $0.01 a share, $0.09 a share, and $0.17 a share. And she wound up taking the middle one, $0.09 a share. I don't have 3553A in front of me. Maybe I can get it. But is it likely that this man is going to do this again, or is it dangerous to society? Oh, I do have 3553A ahead of me. I'm really very concerned about the sentence in this case. Judge Rambo was also cognizant of the fact. Okay. Look at the fact. Yeah, let's look at the factors. Okay, it was certainly serious to afford adequate deterrence to criminal conduct, to protect the public from further crimes, to provide the defendant who is now 71 years old. Is that right? He's in his 80s, Your Honor. My God. To provide him with needed educational. I believe he was age 76 at the time of trial or sentencing, which trial was 2003. I'm not exactly sure of his age. Yes. Yeah. Why was it reasonable, or why does it remain reasonable for him to stay in jail in light of those factors that have to be considered? All I can tell you is that Judge Rambo dutifully and scrupulously considered all the sentencing factors. But we have a responsibility, too. In other words, this is an appeal, and one of the things that they raise on appeal is the length of the sentence, and we have to decide if it's reasonable. So I'm asking you not why she was reasonable, but why it would be reasonable for us not to send it back for reconsideration. And I think that's how you would evaluate the sentence, by examining exactly how she got to that number, Your Honor. This was a careful process. This wasn't willy-nilly. Nobody's suggesting that she was, at least I don't think the other side is suggesting she was sloppy. They're saying she was wrong. So what Judge Slover is pressing you for, and what I'd like to hear, too, is what are the reasons why this is a substantively reasonable sentence? From the government's perspective, you know, talk to us about the character of the offense, the character of the offender, look at the 35-50, make the pitch that 10 years is within the discretion that a reasonable judge could exercise in sentencing this defendant for the crime of conviction. We got to the 120-month guideline range primarily due to two factors. One, the amount of loss in the case. Well, they're not saying that that was wrong. I don't understand them to say. I don't understand them to argue. They're just saying it's not reasonable. It's just too high. It's not reasonable. Look at 35-53, and it doesn't apply here. And you, Court of Appeals, it's your obligation to look at it and decide that. Right, and you're saying the loss is one thing to look at. Yeah, and that's what drove the guidelines, Your Honor, one thing. The large part. There was a $23 million total loss that added 15 offense levels to the offense. That's what got us up to 120 months. The second factor responsible for the high guideline range was the four-level enhancement she gave Mr. Brown for his leadership role in this offense. She discussed at length. Well, don't tell us what she discussed. You tell us what his leadership role was and why it warrants the kind of sentence he got. Mr. Brown was found by the district court, and the government's proof showed that he was the linchpin of this conspiracy, not only to defraud Rite Aid but to obstruct justice. Through Mr. Brown, he orchestrated the acts of several others and encouraged and directed others, three or four other people, to go into the grand jury and to commit perjury. Did the backdating of the severance letters give him more money, too? It would have had the scheme succeeded, but the company never honored the backdated severance letters. They didn't? They did not. They were presented, but the company refused to pay them. I see. Can I change gears for just a minute? Sure, go ahead. Talk to us, if you would, about the plea and the assertion by your opponents. You know, we took up most of Mr. Goldberger's time talking about the plea. Would you respond specifically to his assertion that it was not within the court's discretion to decide whether or not to accept this arrangement because it was exclusively an executive branch function to decide whether to drop counts or not? Counsel is dead wrong about that. If you take a look at Rule 11, which governs guilty pleas, this was a Rule 11C1A plea agreement, and it was a Rule C1A plea agreement because it called for the government to move for the dismissal of the remaining counts against Mr. Brown. Under Rule 48, the government cannot unilaterally dismiss counts. It can only be done with leave of court. And there are important policy and societal interests for that reason. This court addressed them in Ingrid Richards. We talked about that case in our brief. The court is designed to be in the posture to consider at the propriety what the government's doing, and that unilateral power is not granted to the government. And because it was a C1C plea agreement, C1A, it's not a C plea, right? It was a C1A plea. Not a C1C. That's the stipulated sentence. Right, and that is not what we have here. That's not what we have here. All right. But because it was a C1A, the court is specifically granted the power to defer its decision on acceptance of the plea agreement until it receives a pre-sentence report, and that's in Rule 11C3. Mm-hmm. Now, was the district court here, actually a comment was made which has led the defense to assert that there were ex parte communications, and that's been raised again here today. What prompted the prosecutor to say words to the effect of, as we discussed yesterday? What was that about? Your Honor, I don't know how to answer that other than to point out that on a cold record, they are ambiguous and subject to different interpretations. I don't know what Mr. Marino was referring to. What's ambiguous about as we discussed yesterday? Sounds like yesterday there was a discussion. All I can tell you, Your Honor, is that Mr. Marino could have been referring to the letter that was sent down from the judge the day before. I don't know. But I do know this, that the court did not reject that plea agreement. That's another. The court never rejected that plea agreement. It stated its intention the day before. It had a bad day, quite frankly, and the next day realized I'm going to consider this and I'm going to give it some time. And that was clear from that conference, from the very beginning, she told counsel. Explain why it was clear. Give us an explanation of what the judge said and where the responsibility to move the process forward was at that point. You can take a look at the transcript, Your Honor, but as soon as we walked into that conference room, as soon as the letter was raised, Judge Rambl's first response is, I'm not going to read that letter. And as soon as counsel shut up and gave her a chance to explain what she was thinking and saying, she told everyone, I'm going to defer a ruling on this until I see the pre-sentence report. My letter was a result of my initial understanding of what the facts were. I now realize I want to see what's actually in the pre-sentence report. All right. Thank you. I don't have anything else. Thank you very much. Thank you, Your Honor. Mr. Dershowitz, you have three minutes, I think, of rebuttal. Is that right, Pat? That's right. And you're timing it, right? I may have to use my Brooklyn speed in order to be able to cover it. Just very quickly, what the court did not do at sentencing is review the 3553 factors and then make a determination as to what sentence is the lowest possible sentence to effectuate the result. Yeah, but we have said that the court, a lot of ours and other courts have said, you don't have to do that explicitly. She didn't do it in? We don't know whether she did it internally. Well, the answer is if you look at what she said, she was doing it at an interim time period, and so what she was doing is she used the guidelines and then thought she had absolute discretion and in no way refers to the 3553. Of course I cannot tell what was in her mind. I can tell what the record reflects. Let me jump around a little bit, Your Honors, if I can. Are you saying she never mentioned 3553? I don't believe she ever mentioned 3553. She certainly did not in any way express the notion that she was bound to by 3553. So the most we could do is remand so that she can reconsider it in light of 3553. Yes, and the question would be, there are other questions as to whether she should go to a different judge, but yes, that would be, yes. Let me address the plea agreement. If you send it to a different judge, you're really slapping that judge. If we don't think she did anything wrong enough to require slapping, then that's not the remedy. That's correct. Judge Jordan, let me answer three of your questions. First, the government never gave you an answer to the question as to whether it was ex-party conversations. They're an officer of the court. They know if there were conversations. Just to say the cold record doesn't prove it, I think. You can't say that because you're, by saying that you're demeaning the honesty of the answer, and you can't really do that. Your Honor, if there is a record which says there was a prior conversation and we say the record shows it yesterday, and the only way to have a discussion yesterday in the absence of the defendant is an ex-party conversation, with all due respect, Your Honor, I'm not the court. If I were the court, I would say to the U.S. Attorney, was there an ex-party conversation? You know it. Answer the question. You didn't ask that. Was that ever asked? Was that issue ever put to the fact finder? I mean, how did that come up in the district court? In other words, in the district court, did you say the record shows the following, and Your Honor, we think there was. There's never a response to that. No indication by anybody denying that. Was the judge ever put in a position where she could say we didn't have a discussion? The answer is she could have. The way the record reads, it seems clear. Did the defense ask her to do that? Yeah. I guess the question being pressed on you, Mr. Dershowitz, is, and it certainly wouldn't be the ideal position for an advocate to be in, but did anybody say, Your Honor, was there a discussion with the other side when we weren't around? It seemed clear that there was discussion from what was said, so you don't say that. In line with your statement that I ought to press for an answer, I'm taking that as a no, right? There wasn't anybody who said that. No, there was no, because I think the record is clear that there was an ex-party conversation the day before. Can I follow up that real quickly? Sorry about that. Go ahead. Assume you were right, and this really should not a happen thing happen, and there was a discussion. Since what occurred was, the way I read it, she said, I'm not taking the position that I'd indicated I would. On the contrary, I'm going to consider this. I'm going to wait to see the pre-sentence report. What happened in the case, what does that ex-party communication, if it took place, have in the way of impact at all? I think that is the heart and soul question, and let me answer the question. Let's divide for one second the plea and the sentence that will be imposed and the plea agreement, which has certain characteristics in it that have nothing to do with the judiciary. A plea agreement can have things unrelated to the court and can have things that are affecting the court. To the extent that anything is affecting the court, undoubtedly the court has power to review that, and there is a question as to whether or not the court can say, I'm not going to allow the dismissal of other counts. There's a conflict in the law on that, but that's not an issue here. The judge agreed that's an executive function. You can dismiss all the other counts. I have no power. Now you have the question. She has full discretion as to what to do with sentencing. What she was asking for more information on, among other things, is I have an attitude as to how bad this defendant is. I will accept other information with respect to that. I'll wait for the plea, for the sentence, for that purpose. That's on the plea. The plea agreement, I say, is an executive function. The only problem with... nothing binds the court. The court can still give five years if the court chooses to, if it goes through the proper processes, and I suggest that she wasn't going through the proper processes here because she prejudged what she was going to do. Put that aside. Put that completely aside. Completely aside all of the ex parte conversations. What I am saying, Your Honor, is if I have an agreement with the government, which in no way affects the court, you have all your discretion, all your power, you can do everything you want, you cannot reject the plea agreement that I have made with the government, which benefits me and the government. It is not your function. So I'll give you three examples. I think I got your position. Okay. Let me just... Jordan is the only one who was a trial judge. I think that you have used your time. I'm sorry? I think you've used your time. Okay. The red light's on. All right. Thank you very much. Thank you very much. Thank you. We'll take the matter under advisement. And we'll hear counsel and parishes. Let me just have a couple of minutes for recess. Okay. In a few minutes, we'll recess. Yeah. Yeah. We won't get lunch. Lunch won't be good. We'll take recess. Well, he's going to... Yeah.